94 F.3d 647
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Jerry RICHMOND, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner of Social Security,
[1] Defendant-Appellee.
 No. 95-3461.
 United States Court of Appeals, Seventh Circuit.
 Argued April 24, 1996.
Decided Aug. 16, 1996.
 
 Before POSNER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 Jerry Richmond was denied Supplemental Security Income (SSI) benefits because Administrative Law Judge Arlander Keys found that he had the residual functional capacity (RFC) to perform the full range of light work during the relevant period from April 29, 1985 through June 20, 1987. Given his education and age, Richmond was therefore not disabled. Richmond suffers from osteoarthritis, especially in his back, right hand, right hip and right knee. He also has an extensive history of alcoholism. On appeal, Richmond claims that the ALJ erred by failing to find that his limited ability to stand and walk due to arthritis and its concomitant pain substantially eroded his ability to perform light work. He also claims that his alcoholism similarly limits his ability to work.[2] We affirm.
 
 
 2
 After another ALJ, Lawrence P. Ashley, had denied benefits, the district court eventually remanded this case because the absence of counsel at an evidentiary hearing had prejudiced Richmond. This remand order is the subject of a published opinion issuing today. Upon remand, ALJ Keys arrived at the same general conclusion as ALJ Ashley: Richmond was not disabled during the relevant period. ALJ Keys found that Richmond had a severe impairment that did not meet or equal a listed impairment in 20 C.F.R. § 404, Subpt. P, App. 1. He also found that Richmond could not return to his past relevant work as a mail carrier.[3] Finally, ALJ Keys applied the Medical-Vocational Guidelines, 20 C.F.R. 404, Subpt. P, App. 2 (the "grids"). Richmond had a limited education and no transferrable work skills, and he was closely approaching advanced age. Thus, the finding of disability turned on his capacity for light work. If he could perform the full range of light work, he was not disabled. On the other hand, if he could perform only sedentary work, the other factors mandated a finding of disability. 20 C.F.R. 404, Subpt. P, App. 2, Table 1, Rules 201.10, 202.11 (1991). ALJ Keys found that Richmond had the RFC for the full range of light work and that he was not disabled.
 
 
 3
 ALJ Keys relied heavily on Richmond's testimony at an evidentiary hearing, which the ALJ summarized as follows:
 
 
 4
 With regard to his physical problems between 1985 and 1987, he testified that he started using a cane in 1986 or 1987 because of pain in his left knee. He would walk the twelve blocks to the library almost every day, even though his knee would hurt. He would walk a few blocks and stop and swing the leg, and then go on. He would go anywhere he wanted to go as far as walking was concerned. He did not have any problems lifting and worked as a driver for a landscaper. He did not have to do any lifting on that job. When he was working, he would go for four or five weeks without drinking. He was having some problem with his right hand which would sometimes lock up on him and he would have to pull it open.
 
 
 5
 (AR at 202; see id. at 205.) ALJ Keys noted that Dr. Schiff, a medical expert who had testified at the hearing, had found only one solid psychological diagnosis: alcoholism, which was not severe. In light of his hearing testimony concerning his daily activities and functional restrictions, the ALJ concluded that Richmond's subjective complaints, including pain, were not reasonably related to the medical signs and findings. ALJ Keys also discussed the findings of ALJ Richard J. Murphy, who had reviewed and granted in part a second application that Richmond had filed on April 16, 1987. ALJ Murphy found that Richmond, who retained the RFC for light work, was not disabled prior to his fifty-fifth birthday, June 21, 1987. On that date, Richmond reached "advanced age," which meant that even if he could perform light work, he was disabled according to the grids.
 
 
 6
 The Appeals Council let ALJ Keys' decision stand as its decision. The district court allowed Richmond to reinstate his case after the remand and referred the case to a magistrate judge. The magistrate judge recommended remanding again because ALJ Keys had erred in assessing Richmond's physical RFC. The district court rejected the recommendation to the extent that it found error with ALJ Keys' decision. Relying on Richmond's hearing testimony, the district court found substantial evidence to support ALJ Keys' decision and granted judgment in favor of the Commissioner. Richmond filed a timely motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e). The district court denied the motion. Although Richmond had suggested alternative interpretations of the hearing testimony, the court found that ALJ Keys' interpretation of the testimony was valid. The court also held that ALJ Keys could rely on and reaffirm ALJ Murphy's decision that Richmond had the RFC for light work. Richmond filed a timely notice of appeal from the district court's denial of his Rule 59(e) motion.
 
 
 7
 A district court's decision to grant or deny a Rule 59(e) motion is reviewed for an abuse of discretion. Retired Chicago Police Ass'n v. City of Chicago, 76 F.3d 856, 867 (7th Cir.1996). Although Richmond's notice of appeal only mentions the denial of the Rule 59(e) motion, this court may also review directly the merits of the underlying action. Petru v. City of Berwyn, 872 F.2d 1359, 1361-62 (7th Cir.1989). We will uphold the Commissioner's determination that an individual retains the residual functional capacity to perform the full range of light work if it is supported by substantial evidence. Diaz v. Chater, 55 F.3d 300, 305 (7th Cir.1995).
 
 
 8
 Although a mere scintilla of proof will not suffice to uphold the SSA's findings, the standard of substantial evidence requires no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." .... We cannot substitute our own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled.
 
 
 9
 Id. (citations omitted). An ALJ's credibility determinations will not be reversed unless patently wrong. Id. at 308.
 
 
 10
 I. Richmond's RFC for light work.
 
 
 11
 "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. ... [A] job is in this category when it requires a good deal of walking or standing...." 20 C.F.R. § 416.967 (1991). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." S.S.R. 83-10, reprinted in, Department of Health & Human Services, Social Security Rulings 179 (1983 cum. ed.). Richmond asserts that the evidence, if properly construed, reveals limitations on his ability to stand and walk that substantially undermine his ability to perform light work.[4] First, Richmond contends that ALJ Keys allegedly failed to sufficiently account for contrary evidence in his explanation of why Richmond remained capable of light work. Second, he claims that in order to find that pain was not a significant limitation on his ability to stand and walk, the ALJ must have construed the evidence in a manner contrary to logic. Third, he argues that since the ALJ should have found a substantial erosion of the potential occupational base, the ALJ also needed to obtain the testimony of a vocational expert.
 
 
 12
 On May 24, 1985, Dr. Carol Noeztel indicated that Richmond had reported a five year history of joint pains in the right knee, left elbow and right hand. A radiology report from three days before indicated moderate degenerative osteoarthritic changes with predominantly medial joint space narrowing, subchondral sclerosis, a small spur projecting from the patella and some mild or early secondary osteophytes.[5] Dr. Noetzel found that the range motion in Richmond's joints was normal except for "limited flexion of the left knee to 100 degrees." She also found a decreased grip in the right hand and observed his severe difficulty walking on his toes or squatting. On the other hand, she also observed that "the patient had a normal gait and did not use an assistive device." (AR at 120; see id. at 119 (same).) Richmond had reported that "he can walk three or four blocks, stand 10 to 15 minutes." (AR at 118.)
 
 
 13
 Other medical records further document Richmond's medical condition. The medical certificate dated June 19, 1985 mentions complaints of pain in the right knee for the prior two months. The hospital summary for Richmond's subsequent July/August 1985 hospitalization for alcoholism does not include any reference to arthritis or difficulty walking. He was deemed capable of returning to full employment immediately. A radiology report dated November 5, 1986 mentioned degenerative changes to Richmond's spine, mainly at the L5-S1 level, "with large anterior osteophyte formation," and to his knee with narrowing of the joint space and some osteophyte formation. Various disability determination reports from 1985 mentioned degenerative joint disease in right knee, (AR at 72 (Apr. 29, 1985)), impaired range of motion in the left knee, (AR at 59 (June 18, 1985)), and joint disease (AR at 67 (Dec. 18, 1985)). On January 13, 1986, Dr. Adusumilli, Richmond's physician, reported that his patient had degenerative arthritis in his lumbosacral spine and was "restricted to 20 degrees in flexion on the right knee. The straight leg raising test indicates 80 degrees to his right and 70 degrees to his left." (AR at 144.) Richmond visited Dr. Adusumilli several times between December 1985 and July 1986 for back and knee pain and hypertension. At some point during this period, he was taking Indocin four times a day for his arthritis.
 
 
 14
 After the relevant period ended, Richmond's problems continued. On August 27, 1987, Richmond told Dr. Joseph E. Woo that "[h]e can ambulate about two blocks without encountering pain in the right hip or knee." (AR at 433.) He "denied any intermittent claudication[s][6] in association with the pain in the right hip or right knee joint." (AR at 433.) Dr. Woo noted swelling over Richmond's right knuckle, which interfered with his dexterity, and slight difficulty in opening the right hand once closed. He also found that internal rotation of both hip joints elicited pain, but not flexion or extension of either joint. Richmond's gait was slow, and he favored the right hip. Although he could walk on his toes, he could not walk on his heels (especially his right heel) because of the pain it caused in his right hip and knee joints. On November 16, 1987, Richmond visited Dr. Adusumilli for pain in his back, right hip and right knee. He was taking Indocin three times a day. The doctor reported that "there are restrictions of the right knee movements about 5? [sic]" and that "medically, he is unable to do any gainful work." (AR at 451-52.) On January 22, 1988, Dr. Hyun T. Oh wrote to Dr. Adusumilli to inform him of a visit by Richmond two days before. Dr. Oh relayed Richmond's complaints of pain in his right hand, hip and knee and observed that Richmond had difficulty walking due to buckling of the right knee. X-rays showed degenerative arthritis of right knee and right index finger, and Dr. Oh also had the impression of compressive lumbar radiculitis.
 
 
 15
 Although the examining physicians noted various problems related to walking, in four physical RFC assessments from before during and after the relevant period, reviewers of the medical evidence concluded that Richmond could stand and/or walk for six hours out of an eight hour day.[7] In addition, Hewitt Douglass, a vocational assessment specialist, initially concluded on November 25, 1985 that Richmond was capable of the full range of medium work. On February 20, 1986, in light of a subsequent RFC assessment noting significant limitations on crouching, crawling, kneeling and climbing, Douglass concluded that Richmond could not perform the majority of jobs at the medium exertional level. However, he found Richmond not disabled because a significant number of light jobs remained available. Several months after the end of the relevant period, Iris Qadeem, another vocational assessment specialist, opined that Richmond was capable of light work, although he was limited to occasional climbing.
 
 
 16
 Richmond characterizes ALJ Keys' assessment of his ability to perform light work as a failure to consider contrary evidence.
 
 
 17
 An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimal level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.... An ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required.
 
 
 18
 Diaz, 55 F.3d at 307. Richmond believes that ALJ Keys must have disregarded his testimony that pain caused him to pause intermittently and swing his knee when he walked. (See AR at 284.)
 
 
 19
 In light of the ALJ's emphasis on his daily activities, the path of ALJ Keys' reasoning concerning the ability to walk is not difficult to trace. ALJ Keys mentioned the need to pause, but also observed the things that Richmond was able to do despite his alleged pain: walk twelve blocks to the library almost every day, stop by the store and walk to the canal to sit and watch the barges all day. Richmond objects to the ALJ's characterization that he admitted that he could walk wherever he wished. However, he had testified that there were only a couple of places of interest to visit and never mentioned an instance in which he could not visit them. When asked if there were days when he could not walk to the library or "anything else" because of his knee problem, he said "I'd go anyway." (AR at 300.)
 
 
 20
 Richmond claims that ALJ Keys ignored his testimony concerning his ability to stand. At the evidentiary hearing, Richmond and his attorney had the following exchange:
 
 
 21
 Q: How long could you stand back--We're talking now between '85 and '87. How long could you stand for?
 
 
 22
 A: I can't really recall. But I know one thing. I can't stand up--It really gets me then. I got to move, I got to wiggle.
 
 
 23
 ALJ: She's talking about 1985, '87 though.
 
 
 24
 A: I really can't recall specifically.
 
 
 25
 Q: Could you stand for an hour, do you think? Less than an hour, more than an hour?
 
 
 26
 A: No, I couldn't--no ma'am. I couldn't stand still. If I be moving I could, I could move.
 
 
 27
 (AR at 300.) Construed ordinarily, Richmond's first response referred to his current condition in 1991. Richmond's counsel argues that as an African-American with a limited education, he spoke in the present tense where someone else would use the past tense. However, the hearing transcript shows that he used the past tense to describe past events when the distinction between past and present was called to his attention. Although he did discuss the activities of the landscaping company in the present tense, these comments are not sufficient to render his testimony ambiguous. On the other hand, Richmond's third response, fairly construed, may refer to the past. This comment is not necessarily dispositive of the issue of disability. Although it indicates that he could not stand absolutely still, he could stand for some period of time if allowed to move or wiggle. Light work requires the ability to stand for substantial periods of time, but few jobs require an employee to stand perfectly still for six hours out of an eight hour day. An ALJ need not provide a written evaluation of every piece of evidence. Diaz, 55 F.3d at 308. ALJ Keys generally discussed Richmond's account of his functional limitations and daily activities--and indeed, he relied heavily on it in his analysis. We do not consider the failure to mention this particular statement (which followed on the heels of declarations that he could not recall how long he could stand) to constitute reversible error.
 
 
 28
 Richmond also contends that ALJ Keys' discussion of ALJ Murphy's findings constitutes the improper selective use of evidence. In summarizing the medical evidence of arthritis, ALJ Murphy observed that Richmond's "diffuse arthritis can reasonably affect the claimant's ability to ambulate." (AR at 561.) Nonetheless, the ALJ concluded that despite the arthritis, it was reasonable to find that he could stand or walk for six hours out of an eight hour day. ALJ Murphy accounted for the effect of this pain by finding that it prevented Richmond from straining to lift more than light weight. On remand, Richmond argued before ALJ Keys that ALJ Murphy's statement concerning the arthritis contradicted his findings concerning the capacity for light work. In choosing to concur with ALJ Murphy's assessment of the ability to perform light work, Judge Key's pointed out that "[w]hile the claimant's counsel's interpretation of portions of [the medical] evidence (Exhibit 44) differ from Judge Murphy's, as can be expected, that interpretation does not outweigh the weight given by [me] to the admissions made by the claimant during the hearing." (AR at 204.) ALJ Keys not only rejected the assertion that ALJ Murphy's ultimate conclusion represented a misinterpretation of the evidence, but he said that ALJ Murphy's conclusion was conservative based upon the evidence before him. The failure to mention the particular comment by ALJ Murphy is not reversible error; ALJ Keys evidently considered Richmond's arguments.
 
 
 29
 Richmond claims that no one could accept his testimony and still conclude that a person in his condition could perform the full range of light work. Although this court cannot reweigh the evidence, it may find reversible error if the ALJ's interpretation of a piece of evidence is simply illogical and has a material bearing on the disability determination.[8] DeFrancesco v. Bowen, 867 F.2d 1040, 1043-44 (7th Cir.1989); see Sarchett v. Chater, 78 F.3d 305, 307 (7th Cir.1996). Furthermore, if Richmond was significantly limited, the ALJ was required to obtain a vocational expert's opinion on the number of available jobs instead of applying the grid. "[W]here a non-exertional limitation might substantially reduce a range of work an individual can perform, the ALJ must consult a vocational expert." Luna v. Shalala, 22 F.3d 687, 691 (7th Cir.1994); but cf. Binion v. Shalala, 13 F.3d 243, 247 (7th Cir.1994). On the other hand, if the ALJ's finding that Richmond lacked significant nonexertional limitations is logical and supported by substantial evidence, then he did not need the services of a vocational expert. Binion, 13 F.3d at 247 (holding that extent of disabling effect of pain is question of fact and that ALJ may use grids if pain does not interfere with ability to work).
 
 
 30
 There is a difference between appellate review for a "logical error" and merely reweighing the evidence to substitute one's own judgment. Richmond relies heavily on DeFrancesco, 867 F.2d at 1044, in which a claimant suffered from intermittent claudications that prevented him from walking more than a block without needing to sit and rest, occasionally numb feet and an inability to stand for more than ten or fifteen minutes without needing a break. A physician who had found that DeFrancesco could perform light work "conceded that DeFrancesco would tire more rapidly than a healthy person, even if he did interrupt his standing or walking every few minutes." Id. We concluded that in light of the occasional numbness, which effectively rendered the claimant totally disabled for any light work involving the use of foot controls, his limitations on standing and walking, and the fact that the physician had not been asked to focus on the claimant's lack of endurance, substantial evidence did not support the ALJ's determination that the restriction on the ability to perform light work was slight. Id. at 1044-45; see also Schroeter v. Sullivan, 977 F.2d 391, 395 (7th Cir.1992) (finding lack of substantial evidence to support ALJ's finding that claimant could perform full range of light work given ALJ's finding that claimant could not stand for extended periods, in spite of Secretary's suggestion that claimant could alternately sit for five minutes and stand for twenty minutes). In contrast to the claimant in DeFrancesco, Richmond could walk twice as far without pausing, paused half as long on average (perhaps thirty seconds to a minute), and did not need to sit down when he paused. In addition, Richmond has not demonstrated on appeal the existence of any similar sort of disabling numbness or propensity to tire more rapidly than other individuals during the work day to compound this limitation.
 
 
 31
 Richmond had arthritis, and it caused him pain. In addition to the need to pause every so often while walking, Richmond started using a cane in 1986 or 1987.[9] A reasonable finder of fact could conclude that the impediment was a significant limitation that required the assistance of a vocational expert. However, ALJ Keys did not, and his interpretation of the evidence is also reasonable. Physical RFC determinations before, during and after the relevant period indicated that Richmond could stand and/or walk for six hours out of an eight hour day.[10] He would walk to the library (twelve blocks each way) almost every day and admitted that pain did not deter him from walking where he wanted to. Evidence of discomfort while walking and some limitation of range of motion in his knee is not inherently inconsistent with the ability to perform light work such that the ALJ's finding is simply illogical.[11] See Luna, 22 F.3d at 692 (holding that based on claimant's testimony, hand restrictions did not significantly impact ability to perform full range of sedentary work); cf. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir.1990) (affirming ALJ's decision that pain and discomfort, although significant, did not preclude full range of light work, especially in light of his daily activities which included, among other things, walking three-fourths of a mile daily).
 
 
 32
 II. Alcoholism.
 
 
 33
 Richmond also claims that ALJ Keys erred by failing to obtain the services of a vocational expert to assess the effects of his alcoholism. If there is substantial evidence to support the ALJ's conclusion that the impairment did not significantly limit his ability to perform light work, then there was no need for a vocational expert's assistance. See also Howell v. Sullivan, 950 F.2d 343, 349 (7th Cir.1991) (finding vocational assessment concerning alcoholism was unnecessary since only evidence was lay testimony about claimant's drinking). The key inquiry in assessing the effect of alcoholism on RFC is whether the claimant could control his alcohol intake and, if not, whether it affected his ability to work. O'Connor v. Sullivan, 938 F.2d 70, 73 (7th Cir.1991).
 
 
 34
 Richmond has a long history of alcoholism. Every reviewer, whether medical expert or ALJ, who filed an OHA Psychiatric Review Technique Form found the presence of a substance addiction disorder. Dr. Darrell Snyder even suggested that it was significantly severe enough to equal one of the listed impairments. In January 1973, Richmond stayed in a Veteran's Administration hospital and was diagnosed with, among other things, alcoholism with fatty metamorphosis of the liver. On July 11, 1985, he was admitted to a VA hospital's alcohol research program for eight days, and then was moved to an alcohol rehabilitation program until he was discharged on August 16, 1985. Medical records mention reports of alcohol-induced amnesia. On January 13, 1986, Dr. Adusumilli reported that Richmond had no physical problems resulting from his alcoholism. On June 4, 1987, Dr. C. Rajmane, who performed a mental status evaluation, noted reports of multiple-term blackout spells and tremors.
 
 
 35
 After the end of the relevant period, Richmond was admitted again to a VA hospital for alcohol dependence from August 14, 1989 through September 1, 1989. Medical records from this stay mention his discussion of alcohol-induced amnesia, but a physician found no impairment of memory or intellectual functioning. On the other hand, Dr. Mario Gallo's psychological test report of October 18, 1990 noted significant cognitive impairment in the area of "tactual" (i.e. tactile) and tactual-spatial problem solving, tactual-spatial memory, cognitive flexibility and motor speed.
 
 
 36
 Although Richmond clearly was an alcoholic who may have had occasional blackouts when he was drinking, there is substantial evidence to support the ALJ's conclusion that he did not lack control over his condition to the degree that it would constitute a significant limitation on his ability to perform light work. At the hearing before ALJ Keys, Richmond testified that he would pick up a pint on the way home from the library and sip it at home, although sometimes he would split a fifth or two of wine with a couple of friends. He never regularly drank more than a pint by himself, and occasionally a little beer.[12] He did mention memory lapses and shakiness. On the other hand, he indicated that he could go perhaps six months after a VA stay before he started drinking heavily. He also said that when working, he can go four or five weeks without drinking. When asked if Richmond could control his drinking, Dr. Schiff equivocated somewhat by saying that there might be times Richmond could not control his drinking, and other times that he could. The doctor also testified that the alcoholism was not very severe and that he could perform simple unskilled work. Based on the evidence, ALJ Keys could conclude that alcoholism did not significantly limit his ability to work if he was employed.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 Effective March 31, 1995, the functions of the Secretary of Health and Human Services in Social Security cases were transferred to the newly-created Social Security Administration. Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464. Pursuant to this Act and Fed.R.App.P. 43(c), Shirley S. Chater, Commissioner of Social Security, is substituted as the Defendant-Appellee
 
 
 [2]
 In addition to the primary complaints of alcoholism and arthritis, the record mentions other medical conditions such as ulcers, tuberculosis and hypertension. However, Richmond does not claim that ALJ Keys failed to adequately address these conditions
 
 
 [3]
 Richmond had worked as a mail carrier from 1954 to 1963, and as a truck driver from 1967 to 1971. (AR at 187, 201, 206; but cf. AR at 33 (driver for 2 1/2 years)). The record also indicates that in the 1980's (the exact dates are unclear), up to and including 1987, Richmond had worked brief stints as a postal worker, drove a truck for a landscaping service, and worked as a security guard for a month
 
 
 [4]
 An "exertional limitation" is a limitation caused by a medical impairment or its symptoms, such as pain, on one or more of the seven primary strength requirements for work: sitting, standing, walking, lifting, carrying, pushing and pulling. 20 C.F.R. § 416.969a(b). "Nonexertional limitations" are limitations caused by an impairment or its symptoms that affect other aspects of job performance, such as stooping, climbing, crawling, crouching, maintaining concentration or understanding or remembering detailed instructions. 20 C.F.R. § 416.969a(c)
 Richmond criticizes ALJ Murphy's method of assessing pain as a nonexertional impairment, and therefore attacks ALJ Keys' decision under the theory that ALJ Keys blindly adopted the other ALJ's position. However, ALJ Keys performed his own analysis and concurred with, rather than deferred to ALJ Murphy's assessment in light of Richmond's testimony. Because Richmond only raises on appeal ALJ Keys' assessment of pain in relation to the ability to stand and walk, we decline to address whether ALJ Keys sufficiently addressed other aspects of Richmond's ability to work such as climbing or crawling.
 
 
 [5]
 An "osteophyte" is "a bony excrescence or osseous outgrowth." Dorland's Illustrated Medical Dictionary at 1202 (1994)
 
 
 [6]
 An "intermittent claudication" is a combination of symptoms of pain, tension and weakness that increase while walking until walking becomes impossible. Dorland's Illustrated Medical Dictionary at 338 (1994)
 
 
 [7]
 AR at 61 (Jan. 25, 1985), 142 (Nov. 20, 1985), 436 (Sept. 17, 1987), 453 (Nov. 20, 1987); see also id. at 72 (disability determination and transmittal of Mar. 4, 1986). The January 25, 1985 RFC may have actually been performed on January 25, 1986. Cf. AR at 61, 160
 
 
 [8]
 Not all of the "logical errors" that Richmond points out are material to the ALJ's final determination. ALJ Keys' statement that Richmond testified that he had no problems lifting is misleading at best, if not illogical, since Richmond said he had no problems because his jobs did not entail any lifting in the first place. However, it did not have a material impact on the ALJ's decision because he concurred with ALJ Murphy, who found that Richmond's problems lifting and carrying limited him to no more than light work, despite ALJ Murphy's generosity in not finding the claimant even less limited. The alleged factual misstatement would only favor the opposite conclusion
 
 
 [9]
 Richmond's personal decision to use a cane does not necessarily mean that he could not walk without one. Evidence that it had become essential does not appear in the record until more than a year after the end of the relevant period. On May 24, 1985, Dr. Noetzel noted that he could walk without an assistive device. On September 10, 1985, Richmond's brother said Richmond used a cane off and on due to "stomach pains." In testifying before ALJ Murphy on November 8, 1988 about his current daily activities, he said he could not walk more than three blocks without his cane. (AR at 260.)
 
 
 [10]
 In his Reply Brief, Richmond asserts that "the opinions of the reviewing physicians did not constitute substantial evidence because they never examined [him]." (Reply Br. at 3.) This assertion is not necessarily true. Although non-examining physicians cannot create substantial evidence by disputing the underlying facts provided inthe medical records or by engaging in pure speculation, their opinions may constitute substantial evidence concerning an individual's ability to walk, sit or stand--sometimes in spite of a treating physician's contrary conclusion. Garrison, 765 F.2d 710, 713 (7th Cir.1985); see DeFrancesco, 867 F.2d at 1043; 20 C.F.R. § 416.927(f)(2) (RFC reviews constitute opinion evidence for ALJ to consider). Richmond does not attempt to argue that the reviewing physicians failed to bring to bear such knowledge or skill. See Garrison, 765 F.2d at 713 (holding that authorities discounting opinions by non-examining physicians do not govern "when the consulting physician brings to the case something of value to the administrative decision, such as ... a greater range of experience that facilitates a comparison of one case against a standard or rule of decision."). We decline to develop such arguments for him. Cf. Fed.R.App.P. 28(a)(6)
 
 
 [11]
 Unlike Richmond, we do not find irreconcilable ALJ Keys' statements that Richmond's hearing testimony was credible and that his complaints of disabling pain were not valid "given the account of his daily activities and functional restrictions." (AR at 206.) The reference to "the account" implies that the "complaints" referred to were Richmond's assertions of disabling pain throughout the course of the litigation, and not to his hearing testimony itself
 
 
 [12]
 This estimate was at the modest end of his reported use over the years. (Cf. AR at 44, 110, 127, 430, 433, 507.)